FILED
11/15/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2019

**ANTHONY TODD GHORMLEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Blount County**
**No. C-24084   Don R. Ash, Senior Judge**

_____

**No. E2018-01625-CCA-R3-PC**
_____

The Petitioner, Anthony Todd Ghormley, appeals the Blount County Circuit Court's denial of his petition for post-conviction relief from his convictions of two counts of attempted first degree murder, one count of especially aggravated kidnapping, one count of especially aggravated burglary, and three counts of aggravated assault and resulting effective sentence of one hundred five years.  On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel and that the trial court was impermissibly biased against him.  Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Anthony Todd Ghormley.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ellen L. Berez and Tyler B. Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I.  Factual Background**

The Petitioner's trial began on September 15, 2009.  On direct appeal of his convictions, this court gave the following factual account of his crimes:

[O]n September 17, 2007, Ghormley and his wife, Karen Van Dyke, had an argument while they were at the home of Gaynell Head, Van Dyke's grandmother. Ghormley returned to his residence, and Van Dyke remained at Head's home, spending the night with Head and Candy Bussey, Van Dyke's cousin. Early in the morning of the next day, while the women were asleep, Ghormley returned to the home. He forced his way through the locked front door and attacked the three women. He struck them each repeatedly with a baseball bat and cut them with a knife. Van Dyke escaped by jumping out a window, and she called police from a neighbor's house. Bussey fled out the front door, which Ghormley had blocked with a chair to prevent entry into the house. When police arrived, Ghormley took Head hostage and locked himself in the bathroom. After a standoff that lasted several hours, Ghormley surrendered and was arrested.

*State v. Anthony Todd Ghormley*, No. E2010-00634-CCA-R3-CD, 2012 WL 171940, at *1 (Tenn. Crim. App. at Knoxville, Jan. 20, 2012).

The jury convicted the Petitioner of two counts of attempted first degree premeditated murder, a Class A felony; one count of especially aggravated kidnapping, a Class A felony; one count of especially aggravated burglary, a Class B felony; and three counts of aggravated assault, a Class C felony.[1] After a sentencing hearing, the trial court ordered that he serve an effective sentence of one hundred five years in confinement.

On direct appeal of his convictions to this court, the Petitioner argued that the trial court erred by refusing to conduct a competency hearing or reset the trial when his competency to stand trial was questioned two weeks before the trial date. *Id.* at *1. The Petitioner also claimed that the trial court erred by allowing him to represent himself for several months during the pretrial proceedings and by allowing the State to amend the indictment on the first day of trial. *Id.* This court held that the trial court erred by not holding a hearing to determine the Petitioner's competency to stand trial and remanded the case for a retrospective competency hearing. *Id.* at *4-5. This court noted that if the

---

[1] We note that the parties' briefs and this court's prior opinions state that the Petitioner was convicted of two counts of especially aggravated burglary. *See State v. Anthony Todd Ghormley*, No. E2013-01932-CCA-R3-CD, 2014 WL 5699517, at *1 (Tenn. Crim. App. at Knoxville, Nov. 5, 2014); *Anthony Todd Ghormley v. State*, No. E2014-00363-CCA-R3-ECN, 2014 WL 7010774, at *1 (Tenn. Crim. App. at Knoxville, Sept. 12, 2014); *State v. Anthony Todd Ghormley*, No. E2010-00634-CCA-R3-CD, 2012 WL 171940, at *1 (Tenn. Crim. App. at Knoxville Jan. 20, 2012). However, the trial record shows that the Petitioner was indicted for and convicted of one count of especially aggravated burglary.

trial court determined that the Petitioner was competent at the time of trial, then the trial court's failure to hold the hearing was harmless error; however, if the trial court determined that the Petitioner was not competent at the time of trial, then the trial court was required to vacate the judgments and grant a new trial. *Id.* at *5. As to the Petitioner's remaining issues, this court held that he was not entitled to relief. *Id.* at *6-9.

The trial court held the retrospective competency hearing on June 14, 2013. *State v. Anthony Todd Ghormley*, No. E2013-01932-CCA-R3-CD, 2014 WL 5699517, at *1 (Tenn. Crim. App. at Knoxville, Nov. 5, 2014), *perm. app. denied*, (Tenn. Feb. 19, 2015). At the hearing, the Petitioner testified that he was diagnosed with bipolar disorder, that he was prescribed Paxil and Depakote, and that he refused to take any medication in the two weeks before trial. *Id.* The Petitioner said he thought his trial was a conspiracy that involved trial counsel, the trial court, the prosecutor, and "a woman who worked for the DA's office designed to 'railroad [him] on through the system.'" *Id.* at *2. He also said that during the trial, he began seeing "'shadow people.'" On cross-examination, the Petitioner acknowledged filing a petition for an order of protection to prevent jail officials from making him take his medication. *Id.* Moreover, in the summer of 2008, he filed "a number of pro se motions, each of which was titled aptly and filed in the correct court and each of which cited appropriate legal authorities and asked for specific legal relief." *Id.* He also filed a pro se motion on August 15, 2008, requesting a forensic evaluation. *Id.*

Dr. Rokeya Farooque, a forensic psychiatrist from the Middle Tennessee Mental Health Institute (MTMHI), testified that she evaluated the Petitioner in 2007 and diagnosed him with "'intermittent explosive disorder'" because "'he is not able to control his behavior. He gets upset, he gets agitated. . . . [H]is practice is that he [loses] his temper.'" *Id.* She did not find that the Petitioner had any psychotic disorder, including bipolar disorder. *Id.* The Petitioner was of average intelligence with no cognitive impairments, was aware of the charges, and understood that he would likely be incarcerated for the rest of his life if convicted. *Id.* He also "showed the ability to work with his attorneys and to recognize and distinguish inculpatory and exculpatory evidence, as well as an 'adequate understanding of the adversarial nature of the adjudication process and the roles of the participants.'" *Id.*

Senior Judge Jon Kerry Blackwood, who presided over the Petitioner's trial, testified that the Petitioner had been evaluated at MTMHI and declared competent; therefore, he did not order another evaluation two weeks before trial. *See id.* at *4. Judge Blackwood "'never had any doubt that [the Petitioner] was [anything] but competent'" and thought the Petitioner was "'very intelligent, very articulate.'" *Id.* Judge Blackwood allowed the Petitioner to represent himself for a period of time, but then the Petitioner wrote a letter to the trial court stating that he would accept appointed

- 3 -

counsel. *Id.* Judge Blackwood said that the Petitioner named well-known criminal defense attorneys in Knoxville that he would accept to represent him and that the Petitioner "had enough sense about that to know that he wanted one of the best [attorneys] in Knox County.'" *Id.* The Petitioner also "asked to be transferred to the penitentiary so that he would be afforded a better law library for legal research."[2] *Id.*

Staci Lawhorn, the Blount County Jail Medical Unit Supervisor and a nurse practitioner, testified at the hearing about the Petitioner's refusal to take his medication. *Id.* at *5. She described the Petitioner as "'always cooperative and alert, oriented'" and said that he did not appear to be depressed, delusional, or out of touch with reality. *Id.* On July 28, 2008, the Petitioner asked to see a mental health doctor. *Id.* The clinical social worker at the jail, who acted as a clearing house for those requests, wrote that the Petitioner had a history of demanding medications and then refusing them. *Id.* The Petitioner was taken off the mental health waiting list on December 11, 2008. *See id.*

On July 23, 2013, the trial court ruled that the Petitioner was competent at the time of trial. The Petitioner challenged the trial court's ruling, and this court affirmed the judgment of the trial court. *Id.* at *7. As this court explained,

> Doctor Farooque testified that the defendant was competent and that he did not require medication to maintain his competence. The defendant presented no evidence to the contrary. No evidence indicated that the defendant was, at any time, unable "'to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense.'" [*State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (quoting *State Reid*, 164 S.W.3d 286, 306 (Tenn. 2005)).] Evidence concerning the defendant's behavior and demeanor evinced his competence, as did all of the medical testimony. Finally, the defendant's pro se pleadings, though vituperative, suggested a familiarity with the legal system and an above average ability to assist in the preparation of his defense.

*Id.*

---

[2] The trial record reflects that the trial court denied the Petitioner's request for a transfer but that the Petitioner ultimately was transferred to the Tennessee Department of Correction before trial due to safety concerns.

On February 22, 2016, the Petitioner filed a pro se petition for post-conviction relief, claiming, in pertinent part, that he received the ineffective assistance of counsel because trial counsel ("Counsel") failed to file his notice of insanity defense in a timely manner; failed to prepare a defense and discuss that defense with him; failed to investigate possible witnesses and subpoena them for trial; and failed to investigate his case.[3] The Petitioner also alleged that "Judge Blackwood was clearly biased against [him]" because Judge Blackwood "made many decisions out of spite or anger that harmed [him]." The post-conviction court appointed post-conviction counsel, and post-conviction counsel filed an amended petition.

Counsel testified for the State that he had been an attorney for more than thirty years and first worked in the district attorney's office. He then worked as an assistant public defender and went into private practice. Counsel's general practice included criminal defense, so he had been practicing criminal law his entire career. The trial court appointed Counsel to represent the Petitioner in 2009. At the time of the appointment, Counsel had participated in more than one hundred trials involving misdemeanors and felonies.

Counsel testified that he was the fourth or fifth attorney appointed to the Petitioner's case. Counsel received discovery, shared it with the Petitioner, and went over discovery materials with the Petitioner "in great detail." The Petitioner was a "very intense" client, wanted to know what was happening in his case, and wrote at least three letters per week to Counsel. Counsel said he spoke with the Petitioner more than any other client he ever represented in a criminal case. The State asked if Counsel had a good relationship with the Petitioner, and Counsel answered,

> I would say, yes, I did, although, [the Petitioner] reported me to the board I think, at least, five times during my representation of him, so that part was not so good, but, yes, we communicated regularly. [The Petitioner], from time to time, would make little gifts from either the jail or the pen and send them to me as just a token of thanks, so I felt, for the most part, it was a good relationship.

---

[3] The State filed a motion to dismiss the petition as untimely. The one-year statute of limitations expired on February 19, 2016, and the pro se petition bears a file-stamped date of February 22, 2016. The Petitioner signed and dated the petition on February 17, 2016, but the petition was not notarized. At the post-conviction evidentiary hearing, the Petitioner testified that he put the petition into the prison mailbox on the night of February 17, 2016; therefore, the petition was timely by two days "[p]er the mailbox rule." The post-conviction court denied the State's motion to dismiss, and the State does not contest that ruling on appeal.

- 5 -

Counsel said that the Petitioner's filings with the Board of Professional Responsibility did not affect his representation of the Petitioner because the Petitioner wrote letters to the Board, apologizing and wanting Counsel to continue representing him. The Petitioner was moved from the county jail to prison before trial, and he continued to write letters to Counsel on a regular basis.

Counsel testified that the Petitioner was evaluated at MTMHI after his arrest and that Counsel obtained a large amount of records from MTMHI. Counsel and the Petitioner had "differences of opinions" about defense strategies. The State's evidence was "overwhelming" and showed that the Petitioner committed the acts alleged. Therefore, Counsel and the Petitioner considered whether the Petitioner was competent to assist with his own defense. Counsel also raised the competency issue on direct appeal, and this court remanded the case for a competency hearing. The trial court found that the Petitioner was competent, and Counsel appealed the ruling to this court. The appeal concluded Counsel's representation of the Petitioner.

Counsel testified that he briefly considered an insanity defense but that the Petitioner initially did not want to "go down the path of insanity." Counsel "did not think that would be a good choice anyway" because a defendant had to prove insanity by clear and convincing evidence. The facts in this case did not support an insanity defense, so Counsel decided not to pursue it.

Counsel testified that he may have filed a motion for Judge Blackwood to recuse himself. The Petitioner insisted that Counsel try to have Judge Blackwood removed from the case based upon a constitutional defect in how Judge Blackwood was appointed, but Counsel "saw no merit to that." The Petitioner suggested some witnesses to subpoena to trial. Counsel said that he could not remember their names but that "they would have added nothing to his defense." The Petitioner was "caught red handed" and was "surrounded by the SWAT team and members of law enforcement while he was holding the grandmother hostage at knifepoint." Therefore, Counsel's strategy was to "try to lessen that charge." The State did not make any significant plea offers to the Petitioner, and, in any event, the Petitioner did not want to plead guilty.

Counsel testified that the Petitioner's wife "had issues" and that another witness had some mental disabilities. Therefore, Counsel tried to lessen the impact of their testimony through cross-examination. Counsel said that he hoped the jury "would see fit to dismiss some of the charges or to find a lesser included offense" but that the Petitioner "made representation unbelievably difficult." Upon being questioned by the post-conviction court, Counsel stated, "I felt that much of his behavior was intentionally designed to create chaos and to create, hopefully, appealable issues and, you know, turn it

into the [B]oard." Nevertheless, Counsel wanted to give the Petitioner "the best defense he could have" and "tried to find every legitimate issue and pursue that."

On cross-examination, Counsel testified that he worked on four, first degree murder cases prior to representing the Petitioner. After Counsel's predecessor was relieved from the Petitioner's case, the Petitioner was unrepresented for "a period of time." Counsel was appointed, met with the Petitioner numerous times, and heard a lot of complaints from the Petitioner about the Petitioner's previous attorney. The Petitioner told Counsel that he did not have a copy of his indictment. Although Counsel knew he had given the Petitioner a copy of the indictment, he gave the Petitioner another copy. The Petitioner filed a complaint with the Board of Professional Responsibility soon after Counsel's appointment, and the Petitioner continued to file complaints periodically until trial. Counsel filed at least one motion to withdraw, but the trial court denied the motion.

Counsel testified that he and the Petitioner discussed an insanity defense "early on." However, regarding the Petitioner's ability to appreciate right from wrong, Counsel "did not think there was anything for us to work with." Counsel thought, though, that "there was a legitimate issue with [the Petitioner's] behavior." The Petitioner was "very disruptive" in that he filed pro se motions during Counsel's representation and filed complaints with the Board of Professional Responsibility "for very bogus reasons." Counsel said that the Petitioner seemed to be "working against" Counsel and that the Petitioner was "being his own worst enemy."

Counsel testified that he also "looked into" a diminished capacity defense but that he "did not see a legitimate issue with diminished capacity." Post-conviction counsel asked Counsel to explain the difference between insanity and diminished capacity, and Counsel responded,

> Well, insanity, I mean, you've got to prove that by clear and convincing evidence, which it's a much higher standard and it's the result of a mental disease or defect that affects the ability to tell right from wrong. Diminished capacity might somehow affect the knowing element of this, you know, that his intentional acts, knowing acts that he took such that if he was suffering from some mental illness, but not to the level of right and wrong, that that may have affected him. But in looking at the information that we had from [MTMHI], and I believe that Cherokee briefly looked at him even before that, [I] did not see anything that I thought could -- could help us.

Counsel acknowledged that he may have filed a notice to rely on an insanity defense just before trial. He said that if he did so, the notice was improper and was filed "based upon [the Petitioner's] behavior at that time and his request." Counsel did not think the jury would acquit the Petitioner; therefore, his strategy was to show that the Petitioner was incompetent so that the Petitioner would not go to trial or to convince the jury to convict the Petitioner of lesser-included offenses. Counsel did not remember trying to obtain an independent mental evaluation for the Petitioner and did not know of any witnesses who could have testified about a diminished capacity defense. The Petitioner talked to a woman on the telephone and wanted her to testify at trial. Counsel tried to contact the woman but "did not see any benefit that she would have to this case whatsoever." The woman may have had information that the defense could have used to impeach the Petitioner's wife. Nevertheless, Counsel impeached the Petitioner's wife's credibility "the best that [he] could as far as her past and her conduct."

Counsel testified that a private investigator named "Jessica" worked on the Petitioner's case but that she "did not stay on the case for very long." The private investigator identified some of the State's witnesses and tried to get background information about them. Counsel did not recall working with any other private investigators. He said that the Petitioner "despised" anyone associated with the Petitioner's case, including the assistant district attorney and the trial judge, and that the Petitioner "was sure they were trying to poison him at the jail in his medicine, and, yes, he was sure that the Judge was trying to do something like that." The Petitioner "also accused Judge Blackwood of other inappropriate acts that were just ridiculous."

On redirect examination, Counsel testified that the Petitioner wanted Counsel removed from his case so that he could have another attorney he hoped to have appointed. However, the Petitioner's complaints to the Board of Professional Responsibility made Counsel want to prove that "no matter what [the Petitioner] said or did, that he was going to get good representation." Regarding witnesses, Counsel said he "did not intentionally overlook anyone" who might have helped the Petitioner's defense. After the Petitioner's trial, Counsel continued to represent the Petitioner on two separate appeals. The first appeal was successful in that this court remanded the case to the trial court for a retrospective competency hearing.

Relevant to this appeal, the Petitioner testified that Counsel never gave him a copy of his indictment and that Counsel was lying because "he's trying to save his reputation and not [be] deemed ineffective." The Petitioner said he filed four or five complaints with the Board of Professional Responsibility against Counsel because "[i]t was the only time I could get him to do anything." Counsel filed three motions to withdraw from the Petitioner's case, but the Petitioner asked the trial court to deny the motions. The Petitioner said he had "no choice" but to keep Counsel because Counsel sent him a letter

stating that the trial court was not going to appoint another attorney. The Petitioner said he did not want a "local attorney" because "[t]hey play ball with the DA."

The Petitioner testified that Counsel met with him in jail only two times and that their meetings lasted thirty minutes to one hour. They had two or three "short" conversations on the telephone. The Petitioner "wanted a crime of passion defense," but Counsel was "saying insanity defense and it's all the same thing." Although the Petitioner said that he no longer had a copy of the letter because he gave it to post-conviction counsel, he recalled that Counsel sent a letter to the Petitioner in which he stated that he did not take advice from clients and that he knew more about the law than the Petitioner. Counsel and the Petitioner did not discuss the difference between insanity and incompetence, and Counsel did not talk with the Petitioner about a diminished capacity defense or try to find an expert to testify about diminished capacity. Counsel also did not file the notice of insanity defense in a timely manner, which denied the Petitioner his right to a fair trial.

The Petitioner testified that Counsel failed to contact his "star" witness, Christina Michelle Small. Small "nursed the victim back to health," lived with the victim, and "knew all the things that the victim was doing before . . . this case and afterwards." Small filed a complaint on the Petitioner's behalf with the Board of Professional Responsibility against the district attorney. Subsequently, the district attorney's wife, who was an assistant district attorney, had Small's children taken away from her and placed in the temporary custody of "some lady." Small visited the Petitioner in jail, told him that she had to protect her children, and told him that "I've got to get off your case because they're going to keep my kids." The Petitioner said Small "got her kids on a weekend visitation" and "fled the State." At the time of the post-conviction evidentiary hearing, Small was living in Oklahoma.

The Petitioner testified that he told Counsel eleven days before trial that he was not receiving his medication; however, Counsel did not do anything about the situation. Post-conviction counsel asked how the Petitioner's not receiving his medication affected his ability to work with Counsel, and the Petitioner answered, "Well, of all [my] attorneys, you're the only one I've never filed a board complaint on. . . . I think I've worked real good with you, I mean, [I've] tried to be as helpful as I can." The Petitioner said that when he was not receiving his medication, "sometimes I got the grand conspiracy scheme going stuck in my head, I'm having anxiety or panic attacks." At that point, the post-conviction court stated, "If I recall, . . . you were refusing to take your medications." The Petitioner responded that he refused to take his medication while he was in the Blount County Jail because "[t]hey were trying to poison me." When he was moved to prison, though, he would have taken his medication if it had been given to him. The Petitioner also did not receive any medication during his trial.

The Petitioner testified that Judge Blackwood "committed perjury" at the retrospective competency hearing. Specifically, Judge Blackwood testified that he received a report from MTMHI, which showed that the Petitioner had been evaluated for insanity and incompetency. However, the Petitioner made a public records request to MTMHI, and MTMHI responded that it had never released his medical records to Judge Blackwood. Judge Blackwood also stated at the competency hearing that he began reading the Petitioner's letters to the Petitioner's attorneys, which meant that Judge Blackwood improperly "intercepted and copied" the Petitioner's letters to Counsel and determined the Petitioner's competency based on what the Petitioner said in the letters. Judge Blackwood stated at the competency hearing that he had a "long" colloquy with the Petitioner about the Petitioner's knowledge of the legal system, but the Petitioner thought the colloquy was "too short" for Judge Blackwood to determine that he could represent himself.

The Petitioner testified that he was "billed for [a] law library fee" but that he was denied access to the jail law library. He stated, "Once I raised a motion for access they cut off all access to the law library. The other inmates' requests would get answered, mine would not. I was the only inmate in that jail that was denied one hundred percent access to a law library." The Petitioner said that Counsel should have obtained a private investigator for his case and that a female private investigator never met with him.

The Petitioner testified that Dr. Farooque said at the competency hearing that she saw her clients every forty-eight hours. The Petitioner kept a ledger of the amount of time he spent with his doctors, and his ledger showed that her testimony was untrue. Dr. Farooque also stated at the hearing that the Petitioner asked for an insanity defense many times, but nothing in the Petitioner's file showed that he ever asked for an insanity defense. Staci Lawhorn testified at the Petitioner's motion for new trial hearing that she was not qualified to diagnose him but then testified at his competency hearing that he did not appear depressed, delusional, or out of touch with reality. She also said she did not think he needed to be taking anti-psychotic drugs. The Petitioner stated, "That's a mental health diagnosis and class B misdemeanor." Ms. Lawhorn said at the competency hearing that she saw the Petitioner three or four times per month. The Petitioner said that Ms. Lawhorn's statement was false and that "I never talked to her." Counsel did not cross-examine Dr. Farooque or Ms. Lawhorn at the competency hearing about any discrepancies in their testimony.

On cross-examination, the Petitioner acknowledged that he may have told the trial court at trial that Counsel was "very moral," ethical, and "very competent" but that he did

not remember saying those things.[4] The Petitioner stated that after he received his trial transcripts and saw what Counsel did not do at trial, "that changed everything." The Petitioner acknowledged that he wanted other attorneys he wanted to represent him at trial but denied filing complaints against his trial attorneys so that those attorneys would be appointed to represent him. Instead, the Petitioner filed the complaints because his attorneys were not doing what he asked of them. The Petitioner acknowledged that while Counsel should have called certain witnesses to testify on his behalf at trial, none of those witnesses were present at the evidentiary hearing. Moreover, no doctors were present at the hearing to testify about his insanity defense or competency at trial. The Petitioner acknowledged that Counsel may have met with him when he came to court but said that Counsel met with him in jail only three times. The Petitioner also acknowledged that he never told the trial court that he did not receive a copy of his indictment.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the Petitioner's claim that Counsel failed to investigate and prepare an insanity defense and failed to file a timely notice of insanity, the post-conviction court noted that Counsel filed a notice of insanity on September 14, 2009, and that the motion "focused on Petitioner's competency argument and his not having been on his medications." The post-conviction court accredited Counsel's testimony that he filed the notice just before trial because the Petitioner advised him that the Petitioner was not receiving his medications. The trial court also accredited Counsel's testimony that he considered an insanity defense early in his appointment, that he discussed the defense with the Petitioner, and that the Petitioner did not want to pursue the defense. The post-conviction court noted that in October 2008, while the Petitioner was acting pro se, he indicated that he would not be relying on an insanity defense. Thus, the post-conviction court concluded that the Petitioner failed to show that Counsel was deficient or that he was prejudiced by any deficiency.

As to the Petitioner's claim that Counsel failed to investigate, prepare, and present a defense, the post-conviction court accredited Counsel's testimony that the evidence against the Petitioner was overwhelming but that he tried to show the Petitioner was guilty of lesser-included offenses. The post-conviction court noted that Counsel requested a diminished capacity instruction at trial but that the trial court denied the request. The post-conviction court also noted that Counsel pursued a claim of incompetence even though the Petitioner "was found to be competent to stand trial by MTMHI prior to [Counsel's] appointment." The Petitioner received a retrospective competency hearing and was found to be competent, and he did not present any evidence at the evidentiary hearing to rebut that finding. Thus, the post-conviction court

---

[4] Our review of the trial transcript confirms that the Petitioner told the trial court, "[Trial counsel] is a very moral and ethical attorney and very competent."

- 11 -

determined that the Petitioner failed to show that Counsel was deficient or that he was prejudiced by any deficiency.

Next, the post-conviction court addressed the Petitioner's claim that Counsel should have had Judge Blackwood removed from his case. The post-conviction court accredited Counsel's testimony that the Petitioner wanted to challenge Judge Blackwood's appointment on constitutional grounds but that Counsel thought the issue was without merit. The post-conviction court noted that Counsel nevertheless filed a motion to recuse Judge Blackwood on constitutional grounds on May 14, 2009, and that the trial court addressed the issue at a hearing on August 5, 2009. Thus, the post-conviction court concluded that the Petitioner failed to show deficient performance or prejudice.

As to the Petitioner's claims that Counsel was ineffective by failing to discuss a defense with him, by failing to investigate and subpoena possible witnesses for trial, and by failing to hire an investigator, the post-conviction court accredited Counsel's testimony that he talked with the Petitioner about the case, that the Petitioner was very involved in the case, and that Counsel spent more time with the Petitioner than any other client he had in a criminal case. The post-conviction court also accredited Counsel's testimony that he investigated all information provided by the Petitioner and that he used an investigator "for a period of time." The post-conviction court noted that the Petitioner did not present any witnesses at the evidentiary hearing and did not present any evidence at the hearing that an investigator would have discovered. Thus, the post-conviction court found that the Petitioner was not entitled to relief.

Finally, the post-conviction court addressed the Petitioner's claim that Counsel was ineffective for failing to file motions related to his access to the law library. The post-conviction court stated as follows:

> [T]he record indicates the trial court held a hearing related to Petitioner's alleged lack of access to a law library at which a member of the Blount County Sheriff's Department testified concerning the limited availability of legal resources at the Blount County Jail. The evidence established there was no law library but only an officer who could look up information on Lexis Nexis as resources permitted upon receiving request[s] from jail inmates. The officer testified Petitioner made more requests tha[n] any other inmate and his assistance in looking matters up had to be done for other inmates, as well as Petitioner. At the conclusion of the hearing, the trial court entered an order in which it held

Petitioner did not have a constitutional right to access to a law library even when not represented by counsel. However, the trial court did order the jail to allow Petitioner access to any available legal research per the jail's policies and as resources permitted. In addition, Petitioner's rights were satisfied through the representation of counsel.

Therefore, the post-conviction court concluded that the Petitioner was not entitled to relief.

## II. Analysis

The Petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief because Counsel was ineffective in that Counsel failed to file a timely notice of insanity; never clearly articulated or discussed a coherent or consistent defense with him; did not contact any witnesses who could have assisted with his defense; failed to use or employ a private investigator; failed to cross-examine Dr. Farooque about the number of meetings she had with him and other inconsistencies in her testimony; failed to impeach Staci Lawhorn about her legal inability to diagnose him; and allowed the jail to deny him access to the law library. He also contends that the cumulative effective of Counsel's deficiencies deprived him of his right to a fair trial and that the trial court was biased against him. The State argues that the post-conviction court properly denied the petition. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. *See*

- 13 -

*Fields*, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. *Id.*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

*Goad*, 938 S.W.2d at 370 (citing *Strickland*, 466 U.S. at 697).

First, the Petitioner claims that Counsel was ineffective because he failed to file a timely notice of insanity. However, the post-conviction court accredited Counsel's testimony that he considered an insanity defense early in his appointment, that he discussed the defense with the Petitioner, and that the Petitioner did not want to pursue the defense. Moreover, the record demonstrates that MTMHI evaluated the Petitioner before trial and that medical personnel did not find him to be insane or incompetent. The Petitioner did not present any evidence at the post-conviction hearing regarding his being insane at the time of the crimes. Therefore, the Petitioner has failed to show that Counsel was deficient or that he was prejudiced by any deficiency.

The Petitioner also contends that Counsel never articulated a clear defense strategy. However, the post-conviction court accredited Counsel's testimony that the evidence against the Petitioner was overwhelming; therefore, Counsel's strategy was to show that the Petitioner was incompetent so that the Petitioner would not go to trial or to convince the jury that the Petitioner was guilty of lesser-included offenses. Thus, the Petitioner has failed to demonstrate that Counsel was deficient or that he was prejudiced by any deficiency.

Next, the Petitioner contends that Counsel was ineffective because he did not contact any witnesses or hire a private investigator to assist with his defense. The Petitioner failed to present any witnesses at the evidentiary hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner also failed to present any additional evidence that an investigation would have revealed that would have made a difference at his trial. Accordingly, he failed to demonstrate that he was prejudiced by Counsel's alleged deficiencies.

The Petitioner asserts that Counsel was ineffective for failing to cross-examine Dr. Farooque about inconsistencies in her testimony regarding "the number of visits with [him], her presence for purported meetings with [him], changing diagnoses, and her incorrect statements regarding his claims of insanity" and that Counsel was ineffective for failing to impeach Ms. Lawhorn with "her legal inability diagnoses about [his] competency." However, the Petitioner did not question Counsel about these claims at the evidentiary hearing. Furthermore, although he contends that Counsel's deficiencies prevented him from successfully asserting that he was not competent to stand trial, he did not present any evidence at the evidentiary hearing to contradict the trial court's ruling that he was competent. Accordingly, the Petitioner has failed to demonstrate that Counsel was deficient or that he was prejudiced by any deficiency.

As to the Petitioner's claim that Counsel was ineffective for allowing him to be denied access to the jail law library, the post-conviction court found that the trial court held a hearing on the Petitioner's alleged lack of access to a law library and that the trial court ordered the jail to allow the Petitioner access to any legal research that the jail's policies permitted. Our review of the trial record confirms the findings of the post-conviction court. In any event, the Petitioner has not explained how his lack of access to the jail law library changed the outcome of his case. Therefore, we find no merit to this claim. Likewise, we find no merit to his claim that the cumulative effect of Counsel's errors warrants a reversal of his convictions.

Finally, as to the Petitioner claim that the trial court was biased against him, he has made no argument to support the issue. Therefore, it is waived. *See* Tenn. R. App. P. 36(a).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE